719 P.2d 271

Jose Roberto MONTANO, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF PIMA, and Honorable William L. Scholl, a Judge Pro Tempore thereof, Respondents,

and

The STATE of Arizona, ex rel. Stephen D. NEELY, County Attorney for the County of Pima, Real Party in Interest.

No. 18186–PR.

Supreme Court of Arizona,
En Banc.

April 18, 1986.

Supplemental Opinion June 10, 1986.

Frederic J. Dardis, Pima County Public Defender, Amanda McGee, Deputy Pima County Public Defender, Tucson, for petitioner.

Stephen D. Neely, Pima Co. Atty., Paula Davidon, William Mills, Deputy Pima Co. Attys., Tucson, for respondents.

GORDON, Vice Chief Justice.

We accepted review of this petition after the Court of Appeals declined to accept jurisdiction of a Petition for Special Action arising from the trial court's determination of two issues: whether A.R.S. § 28–691 (the Implied Consent statute) requires all police departments to provide some form of alcohol testing to those arrested for Driving Under the Influence of Intoxicating Liquor (DWI); and whether, when no alcohol test is provided, police must inform those arrested for DWI of their right to an independent chemical test. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Rule 23, Ariz.R.Civ.App.P., 17A A.R.S.

The essential facts of this case have been stipulated to by both parties and are not in dispute. Petitioner, Jose Roberto Montano, was arrested in South Tucson on the early morning of December 8, 1983, for driving under the influence of intoxicating liquor. At the time of petitioner's arrest South Tucson Police Department policy did not require the testing of DWI suspects' breath, blood, or urine for alcohol, presumably because South Tucson had no functioning intoxilyzer machine. South Tucson obtained an intoxilyzer machine in the spring of 1982. It was operational for only two months. From the time the intoxilyzer machine was put out of service in the summer of 1982, until at least April of 1984, South Tucson had no equipment to analyze breath samples for blood-alcohol content. Moreover, the police department had no agreement with any other law enforcement agency to borrow an intoxilyzer machine. Nor did the police department make arrangements with any hospital, laboratory, or medical personnel to analyze blood or urine samples.

As a consequence, upon arrest the petitioner was not requested to submit to any test of his breath, blood, or urine, although the arresting officer could have made such a demand pursuant to A.R.S. § 28–691. Petitioner did not request that any test be done and the arresting officer did not inform the petitioner that he had the right to an independent test of breath, blood, or urine. The policy of the South Tucson Police Department prescribed that when a person requested an independent test he could receive it only at his own expense and only after release from jail for the initial appearance. Suspects in custody who requested an independent blood test were not transported to a doctor or hospital.

After the petitioner's arrest he was taken to the Pima County Jail and booked on a felony DWI charge. The petitioner remained in custody until after 2:00 p.m. when his initial appearance was held— some thirteen hours after his arrest. Petitioner made an offer of proof that he would testify that if he had been requested, he would have submitted to any test of his breath, blood, or urine; that he was not informed of his right to an independent test; and that he was not aware of his right to an independent test. Petitioner moved to dismiss the DWI charge, claiming that A.R.S. § 28–691 requires police to request that all DWI suspects submit to a breath, blood, or urine test, and that in addition failure to inform petitioner of his right to an independent test denies due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, section 4 of the Arizona Constitution. Petitioner's motion to dismiss was denied, and his Special Action to the court of appeals was declined. We granted the petition for review in order to resolve the issues raised by petitioner's motion to dismiss.

I

The petitioner contends that A.R.S. § 28–691, the Implied Consent statute, obligates rather than permits police departments to request tests of breath, blood, or urine of DWI suspects. The petitioner arrives at this conclusion by analyzing the relevant statutory language extant at the time of his arrest. In particular, the petitioner points to the language of A.R.S. § 28–691(B), which at the time of petitioner's arrest stated:

"B. Following an arrest a violator *shall* be requested to submit to any test prescribed by subsection A of this section, and if the violator refuses he shall be informed that his license or permit to drive will be suspended or denied if he refuses to submit to the test."

(emphasis added)

The tests prescribed by subsection A are those of breath, blood, or urine. A.R.S. § 28–691(A) provided:

"A. Any person who operates a motor vehicle within this state gives consent, subject to the provisions of § 28–692, to a test or tests of his blood, breath, or urine for the purpose of determining the alcoholic content of his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor. The test or tests chosen by the law enforcement agency *shall* be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle within this state while under the influence of intoxicating liquor."

(emphasis added)

Petitioner places great weight upon the use of "shall" in A.R.S. § 28–691(A) and (B), suggesting that its use reflects a legislative decision that A.R.S. § 28–691 be mandatory rather than permissive upon police departments. If statutory interpretation turned upon the ordinary meaning of isolated words, bereft of context, we might well be persuaded. However, statutory interpretation is inherently contextual, and A.R.S. § 28–691(A) provided that "[t]he test or tests *chosen* ... shall be administered...." (emphasis added)

█ Emphasizing this different but related word betrays the weakness of petitioner's argument. The discretion conferred upon police departments by the statute is not limited to choosing from among the designated tests, but includes the power to forgo altogether any alcohol testing of DWI suspects. Our reading of A.R.S. § 28–691(A) is consistent with the plain language of the statute and fully comports with the rule of construction that "a court should examine the language used in the statute, the context, the subject matter, the effects, the consequences and the spirit and reason of the law." *Castregon v. Huerta,* 119 Ariz. 343, 345, 580 P.2d 1197, 1199 (1978).

The "spirit and reason" of the implied consent statute "is to remove drunk drivers from the state's highways, not to provide a shield for a drunk driver...." *State v. Waicelunas,* 138 Ariz. 16, 20, 672 P.2d 968, 972 (App.1983). The statute was enacted as an aid to law enforcement agencies, and it would be ironic indeed if the sword offered to law enforcement in our battle against the appalling consequences of drunk driving were transformed into "a shield for a drunk driver." The implied consent statute has always been an invitation to law enforcement which may be declined, not a directive. By promulgating A.R.S. § 28–691 the state extended to law enforcement agencies the opportunity to take advantage of the statute's license suspension provisions, as well as related provisions in A.R.S. § 28–692.

Although the petitioner's theory relies upon statutory language for support and is therefore somewhat state-specific, a brief survey of other jurisdictions with similar statutes confirms that his argument has been consistently rejected. In *People v. Gillett,* 629 P.2d 613 (Colo.1981), the Colorado Supreme Court had occasion to analyze the very issue posed here. In concluding that its implied consent statute is permissive rather than mandatory, the court noted:

"The arresting officer, in the first instance, has the right to invoke the implied consent law by requesting the driver to submit to a chemical test or face revocation of his license. Alternatively, the officer may arrest the driver *without invoking the statute* and the prosecution thereafter may attempt to establish in-

toxication by means other than the statutory presumptions."

629 P.2d at 617 (emphasis added)

In *City of Kettering v. Baker*, 42 Ohio St.2d 351, 328 N.E.2d 805 (1975), the city of Kettering, Ohio, like South Tucson, chose not to perform breath or blood tests. The appellant argued that the city's failure to prescribe chemical sobriety tests violated his constitutional rights. After reviewing Ohio's implied consent statute, R.C. 4511.191, the court concluded, "There is nothing whatsoever in the language stated therein that entitles anyone to the administration of the tests by the city or any arresting officer. Nor can this section be read in such a manner as to impose an obligation mandating these tests." 42 Ohio St.2d at 353, 328 N.E.2d at 807.

Finally, in another leading state case, *Hammer v. Town of Jackson*, 524 P.2d 884 (Wyo.1974), the Wyoming Supreme Court reached the same conclusion with regard to Wyoming's implied consent statute, declaring that:

> "The Implied Consent Law does not require that every person arrested for the offense of driving while under the influence of intoxicating liquor be given a chemical test of his blood, breath or urine. It merely provides that such a person is deemed to have given his consent and provides certain guidelines for the testing in the event that it is used or sought to be used. § 31–247.2(a), W.S. 1957, 1973 Cum.Supp."

524 P.2d at 887.

While we believe that administration of chemical sobriety tests may be desirable in the interests of the driving public, *City of Kettering v. Baker, supra,* we are compelled by the language and spirit of A.R.S. § 28–691 to conclude that its provisions are permissive, not mandatory. If a particular jurisdiction chooses to proceed against drunk drivers only under the authority of A.R.S. § 28–692(A), and forgo prosecution under A.R.S. § 28–692(B), that is a choice offered by the statute.[1]

The petitioner also propounds the argument that so many related statutory provisions, A.R.S. § 28–691 *et seq.*, presume the existence of chemical alcohol testing that the legislature must have intended for them to be mandatory. *See, e.g.,* A.R.S. §§ 28–692(B), 28–692(E), 28–692(I), 28–692(K), and 28–692.01(C). Few would dispute that the legislature has placed great emphasis upon chemical alcohol testing, but this observation does not necessarily redound to the benefit of the petitioner. No specific provision requires the state to request tests, and certainly no "penumbra" emanates from the totality of provisions requiring the state to request tests. As previously noted, the majority of these provisions inure to the benefit of the state, not the suspect, and the state may choose to forgo these benefits. Moreover, even as to those sections which could conceivably benefit the suspect, whatever merit there may be in petitioner's argument is addressed by Part II of this decision, wherein we guarantee that DWI suspects will be fully apprised of their right to preserve or collect objective chemical evidence of sobriety or intoxication. When suspects are informed of their right to independent chemical testing, they may not be heard to complain that the state fails to test. Thus the decision by the South Tucson police department to forgo breath, blood, or urine tests of DWI suspects was a permissible one. While we may question the wisdom of the decision, we cannot deny its statutory legitimacy.

## II

■ In addition to the statutory claim, defendant attacks the constitutionality of

---

1. However, we do not disturb the rule that invocation of A.R.S. § 28–691 is a mandatory precondition to license suspension. In order to proceed with the civil license suspension procedure provided for in A.R.S. § 28–691, the police *must* request the suspect to take one of the prescribed tests and inform him "that his license or permit to drive will be suspended or denied if he refused to submit to the test." A.R.S. § 28–691(B). *See White v. State,* 144 Ariz. 39, 695 P.2d 288 (App.1985); *Cf. State v. Hummel,* 173 Ind.App. 170, 363 N.E.2d 227 (1977).

the state's failure to inform him of his right to an independent blood alcohol test. The right of a DWI suspect to obtain an independent test is well settled in Arizona. *See, e.g., McNutt v. Superior Court of State of Arizona*, 133 Ariz. 7, 648 P.2d 122 (1982) (dismissal of DWI case with prejudice appropriate where state prevented defendant from obtaining independent blood test); *Smith v. Cada*, 114 Ariz. 510, 562 P.2d 390 (App.1977) (right to obtain independent test based upon constitutional principles). However, we have never explicitly held that a suspect must be informed of his right to an independent test, even when the state chooses not to invoke the implied consent statute.[2] The defendant asserts that this omission violated his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, section 4 of the Arizona Constitution. *Smith v. Cada, supra.* We agree.

While the state normally has no obligation to aid a suspect in gathering potentially exculpatory evidence, *see State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977), the unique evidentiary circumstances attendant to DWI arrests justify a narrow exception. The Due Process clause of the Arizona Constitution guarantees to DWI suspects "a *fair chance* to obtain independent evidence of sobriety essential to his defense at the only time it [is] available." *Smith v. Ganske*, 114 Ariz. 515, 517, 562 P.2d 395, 397 (App.1977) (emphasis added). Where, as here, the only objective evidence is inherently evanescent, is virtually dispositive of guilt or innocence, and collecting the evidence places only a slight burden upon the state, due process requires that a suspect be informed of his right to gather the evidence prior to its dissipation.

Our decision that DWI suspects must be informed of their right to an independent chemical alcohol test at their own expense when the state chooses not to invoke the

implied consent statute is a logical step in the evolution of DWI cases. As an examination of the relevant case law reveals, the tenor of our past decisions has been that suspects must be afforded meaningful access to objective scientific evidence of sobriety.

The touchstone of our discussion must, of course, be *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in which the Supreme Court, for the first time, recognized that suppression of evidence by the state may violate the due process clause of the fourteenth amendment. *Brady's* ramifications for the prosecution of DWI cases was first addressed by this Court in *Scales v. City Court of City of Mesa*, 122 Ariz. 231, 594 P.2d 97 (1979), in which we condemned the state's practice of routinely destroying breathalyzer test ampoules. The test ampoules constituted physical evidence "[d]estruction of [which] deprives the defendant of a *crucial source of evidence* with which to attack the validity of the test reading...." 122 Ariz. at 234, 594 P.2d at 100 (emphasis added).

The next year we were called upon to resolve a similar but theoretically distinct issue. In *Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979), the defendant sought to suppress the results of a gas chromatograph intoximeter, which yields no physical evidence comparable to the breathalyzer ampoule. The state argued that since the intoximeter testing itself destroyed the breath sample, it had no "possessable" evidence to suppress. We refused to countenance such an artificial distinction, and ruled that the police had to offer to collect and preserve another breath sample in a field collection unit whenever they chose to give breath tests. "Central to the holdings in *Scales* and *Baca* is the recognition by the supreme court that the test ampoules (in *Scales*) and separate breath sample (in *Baca*) were 'crucial' pieces of evidence, without which the defendant would be un-

---

**2.** When the state does invoke the implied consent statute by administering an intoximeter breath test, it incurs a limited duty to inform the defendant that a second breath sample will

be collected and preserved upon request. *See Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979), and discussion *infra.*

able to effectively challenge the accuracy of the test results offered in evidence against him." *Jhagroo v. City of Phoenix,* 143 Ariz. 595, 598, 694 P.2d 1209, 1212 (App.1984).[3]

*Baca* thus represents a small but significant step in the evolution of *Brady* principles. Unlike *Brady* and *Scales,* which merely proscribe the suppression of existing evidence, *Baca* places an affirmative duty upon the state to collect and preserve evidence under limited circumstances. Our holding in *Baca* did not, of course, change the general rule that the state has no duty to gather evidence for the defense. *State v. Treadaway, supra.* Indeed even the limited expansion of *Brady* recognized in *Baca* may be more of form than substance. As noted by the Colorado Supreme Court, "[t]he failure of the state to collect and preserve evidence, when those acts can be accomplished as a mere incident to a procedure routinely performed by state agents, is tantamount to suppression of that evidence." *Garcia v. District Court, 21st Judicial District,* 197 Colo. 38, 589 P.2d 924, 929–930 (1979), cited with approval in *Baca v. Smith,* 124 Ariz. at 355, 604 P.2d at 619.

Moreover, in order to ensure the meaningful application of *Baca,* we insisted that suspects be "clearly advised that a second sample of ... breath will be taken and preserved...." if requested.[4] Although persons are presumed to know their rights under the law, *see California v. Trombetta,* 467 U.S. 479, 492, 104 S.Ct. 2528, 2535, 81 L.Ed.2d 413 (1984) (O'Connor, J., concurring), due process of law may require, in some instances, more than the grant of a bare legal right without the knowledge necessary to implement it. *Baca v. Smith, supra.*

■ In all of the Arizona cases cited above the state chose to invoke the implied consent law; consequently in each of the cases the defendant was asked to submit to a chemical sobriety test. Because the state gathers valuable evidence from the administration of alcohol testing, or from a defendant's refusal to submit to testing, we had little difficulty in finding a corresponding duty to preserve, or if necessary collect, evidence. *Scales v. City Court, supra, Baca v. Smith, supra.* Due process would be offended if, under the aegis of implied consent, we granted to the state a monopoly over objective means of proof. "The explicit terms of the implied consent law evidence a clear legislative intent to create mutual rights and responsibilities for both the arresting officer and the arrested driver in connection with chemical testing of the alcoholic content of the driver's blood." *People v. Gillett,* 629 P.2d at 617. An essential lesson to be drawn from *McNutt, Scales,* and *Baca* is that a defendant must be allowed to counter the state's scientific evidence of intoxication, or evidence of refusal, with the defendant's own scientific evidence.

Where the state chooses to forgo the benefits of the implied consent law, however, it is suggested that a defendant's commensurate need to rebut the state's scientific case disappears. Under those circumstances the state arguably has no duty to inform suspects of their right to independent testing since the state plans to

---

3. *But see California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (holding that Due Process clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis tests at trial). We discussed the effect of *Trombetta* on established Arizona case law in *Oshrin v. Coulter,* 142 Ariz. 109, 688 P.2d 1001 (1984), and found it inapplicable. *Id.* at 112–113, 688 P.2d at 1004–1005. We reiterate that conclusion today. Wholly apart from its factual limitations, *Trombetta* cannot account for the separate guarantees of the Arizona Constitution.

4. This right can, of course, be waived by the suspect after advisement. Often "the charge of unlawful intoxication may never be contested....", *Baca v. Smith,* 124 Ariz. at 356, 604 P.2d at 620, thus "[w]e do not think it is necessary in every case that a separate sample of a suspect's breath be taken and preserved for his future use." *Id.* It is well settled that a DWI suspect's waiver of *Baca* can be intelligently made without counsel. *Mongan v. Superior Court of the State of Arizona,* 148 Ariz. 486, 715 P.2d 739 (1986).

introduce no test results. While this argument is appealing in the abstract, we must be ever mindful that the treatment of criminal suspects must be examined through the prism of due process; and due process, as we have seen, requires that suspects have a "fair chance" to obtain potentially exculpatory evidence. *Smith v. Ganske, supra.* "The State's obligation is not to convict, but to see that, so far as possible, truth emerges. This is the ultimate statement of its responsibility to provide a fair trial under the Due Process clause of the Fourteenth Amendment." *Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring).

The state's task is made easier when the state procures objective evidence of guilt or innocence, but when the state decides to forgo that evidence due process of law surely demands that the suspect be apprised of the opportunity. The importance of objective, scientific evidence to a fair adjudication has long been recognized in Arizona. *See, e.g., State v. Hannah,* 120 Ariz. 1, 583 P.2d 888 (1978) (accused charged with arson and filing fraudulent insurance claim was denied due process by state's negligent destruction of evidence seized from premises destroyed by the fire, since it could not be determined whether the seized evidence was exculpatory).

DWI cases are no exception; in fact they are particularly susceptible of resolution by way of chemical analysis of intoxication. Nearly three decades ago the Supreme Court noted "the interests of society in the scientific determination of intoxication" in order to convict drunk drivers, "[a]nd the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses." *Breithaupt v. Abram,* 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957). This Court recently recognized that "in a DWI investigation, it is crucial for both the state and the defendant to gather evidence relevant to intoxication close in time to when the defendant allegedly committed the crime. Otherwise, any alcohol that may have been in the blood will have decomposed before

the blood can be tested." *McNutt v. Superior Court,* 133 Ariz. at 10 n. 2, 648 P.2d at 125 n. 2. Thus, when the implied consent statute is not invoked, it is important that DWI suspects be promptly informed upon arrest of their right to secure an independent alcohol test; and the police must make every reasonable effort to facilitate a suspect's request. *See Smith v. Cada, supra; McNutt v. Superior Court, supra.* The state has no obligation, apart from *Baca,* to actually gather evidence for a suspect, but in the absence of the implied consent law it must provide suspects a fair chance to gather evidence by informing them of their right to testing.

The tragic consequences of drunk driving are abhorrent. But our total lack of sympathy for petitioner's behavior may not lead us to condone the suppression of information critical to petitioner's defense. *Giles v. Maryland,* 386 U.S. at 99, 87 S.Ct. at 809–810. The duty to inform DWI suspects of their right to independent testing when the implied consent statute is not invoked is consistent with the prior decisions of this Court. In *Scales* we found a due process duty to preserve evidence from destruction and inform suspects of their right to analyze the evidence; in *Baca* we recognized a duty to collect evidence for suspects, if requested, after informing them of that right; and most recently in *Oshrin v. Coulter,* 142 Ariz. 109, 688 P.2d 1001 (1984), we acknowledged that under limited circumstances there is a further duty to inform defendants that they *should* test their *Baca* sample.

In *Oshrin* the defendant was charged under A.R.S. § 28–692(A) and (B), but was subsequently released and told that the charges against him were dismissed. As a result, the defendant made no effort to examine the breath sample collected at his request pursuant to *Baca.* Two months after the sample was destroyed, felony DWI charges were filed against him. We held that:

"Because it is doubtful that many defendants realize the state may refile

charges after they are released, and therefore do not recognize the importance of testing their Baca samples before the samples are destroyed, the police *should inform defendants being released that the charges,* though presently 'scratched,' *may be refiled,* and therefore the Baca sample *should be tested as soon as practicable."*

142 Ariz. at 113, 688 P.2d at 1005 (emphasis added)

Our decisions in *Scales, Baca,* and *Oshrin* belie the notion that people are always cognizant of the full panoply of rights afforded them by the Constitution. We have recognized before, and do so again today, that under some circumstances people must be informed of their rights if they are to exercise them intelligently. A criminal trial should not be a game of fox and hounds in which the state's aim is to outwit and entrap its quarry. *Giles v. Maryland,* 386 U.S. at 100, 87 S.Ct. at 810. When the state chooses not to pursue chemical testing, a suspect's silence should not be taken as a waiver of his right to seek testing. "A waiver is ordinarily an *intentional* relinquishment or abandonment of a *known* right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added).

We do not believe that our decision today will appreciably burden law enforcement authorities. For example, those local jurisdictions which do employ the implied consent law usually inform suspects of their right to independent testing anyway, *see, e.g., Amos v. Bowen,* 143 Ariz. 324, 693 P.2d 979 (1984), without any apparent difficulty. Requiring police to inform suspects of their right when no test is requested by law enforcement would occasion no real delay, and any burden caused by a suspect's desire to have a test is outweighed by the highly probative value of the resulting evidence.[5]

We are aware that some other jurisdictions would be unlikely to reach the same result, *see, e.g., Ewing v. State,* 300 So.2d 916 (Miss.1974), *State v. Reyna,* 92 Idaho 669, 448 P.2d 762 (1968). However, these decisions are unpersuasive, contrary to more modern state decisions, and contradictory of well-established Arizona case law. We are convinced that our decision fully comports with the dictates of due process and just administration of Arizona law.

The petitioner's request for special action relief is granted; this case is remanded to the trial court with directions to dismiss the DWI charges against Montano with prejudice.

CAMERON and FELDMAN, JJ., concur.

HOLOHAN, Chief Justice, specially concurring and dissenting.

The majority opinion holds that A.R.S. § 28–691(B) does not require that the State request a suspect to submit to a test for the purpose of determining the alcohol content of his blood if arrested for a violation of the DWI statute. I agree with the majority's analysis that the provisions of the subsection are permissive, not mandatory. My disagreement and dissent from the majority opinion is limited to the holding that a person arrested for a violation of the DWI statute must be promptly informed of his right to secure an independent alcohol test to determine the alcohol content of his blood.

Conceding, as the majority does, that the State normally has no obligation to aid a suspect in gathering potentially exculpatory evidence (at pp. 274–275), the majority then makes the quantum leap that the unique evidentiary circumstances attending to DWI arrests justify a narrow exception. Notable is the absence of the citation of any authority which supports such a proposition. The authorities to the contrary are brushed aside as "unpersuasive" and con-

---

**5.** Ironically, the evidence is "much more likely to provide inculpatory than exculpatory evidence." *California v. Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. However, in those cases

where the evidence does absolve the suspect, *see Breithaupt v. Abram, supra,* an important vindication of due process is effected.

trary to "more modern state decisions." Apparently 1968 and 1974 decisions are somehow archaic especially when they reject concepts earnestly desired by the majority.

The few cases arising in this jurisdiction which the majority refers to are all cases in which the State has in some fashion interfered with the efforts of the accused to obtain an independent test to determine the alcohol content of his blood. It is one thing to hold that the State may not interfere with the efforts of a suspect to secure exculpatory evidence, and it is entirely another proposition to conclude that the police must become advisors to the suspect and advise him of the "right" to secure such evidence.

The willingness of the majority to reject competent case authority, and to ignore long-standing rules of law launches us into a revision of due process guided only by the achievement of a desired result. Due process should not depend upon the feeling of a few judges. When this court speaks on an issue, especially one involving the state constitution, the result should comport with generally established principles of what is required and expected of the legal process.

There is nothing uniquely different about the prosecution in a DWI case from that in any other. The majority seems to place great store in the fact that current technology provides a method to more accurately measure the amount of alcohol in a suspect's blood. If a law enforcement department does not have testing equipment, the advice to the accused that he may secure his own test really offers nothing of substance. An accused trying to arrange a blood test from the jail will be a real challenge. How much assistance must law enforcement offer? Must the accused be transported to the testing location? The majority conclude that their new due process requirement will not cause any appreciable burden on law enforcement authorities, but even if it does, the majority believe that the ends justify the burden.

Fortunately, the South Tucson situation of no testing is unique, and today's ruling is limited in its application. My concern, however, is that this court may indulge in more expansive development of due process based on vague personal feelings clothed in rhetoric.

HAYS, J., agrees with Chief Justice HOLOHAN's concurrence and dissent.

## SUPPLEMENTAL OPINION

GORDON, Vice Chief Justice.

We accepted this motion for reconsideration in order to settle a question left unanswered in *Montano v. Superior Court*, No. 18186–PR, filed April 18, 1986, namely, whether the decision is to be retrospectively or prospectively applied. The decision is to be applied prospectively to all arrests occurring after the date of the mandate. In all other respects the motion for reconsideration is denied.

CAMERON and FELDMAN, JJ., concur.