790 P.2d 759

**The STATE of Arizona,
Appellee/Cross–Appellant,**

v.

**Larry YOUNGBLOOD,
Appellant/Cross–Appellee.**

**Nos. 2 CA–CR 3979, 2 CA–CR 4364–2
and 2 CA–CR 89–0141.**

Court of Appeals of Arizona,
Division 2, Department B.

Dec. 28, 1989.

Petition for Review Granted in Part and
Denied in Part May 24, 1990.

## OPINION

LACAGNINA, Judge.

In this appeal on remand from the United States Supreme Court, Larry Youngblood once again argues for reversal of his convictions for child molestation, sexual assault and kidnapping because evidence crucial to his defense was lost.

We find that Youngblood was deprived of a fair trial and denied due process of law under the Arizona Constitution and well-established Arizona case law because the failure to preserve certain evidence resulted in prejudice to him. We reverse his convictions and the sentences imposed, and dismiss the case.

### FACTS

David, the ten-year-old victim, had left a church service he was attending with his mother around 9:30 p.m. on the night of October 29, 1983, and had gone to a nearby carnival where he was approached by a

middle-aged black man of medium height and weight. David, described as a very observant youngster, testified that his assailant was a black man named Damian or Carl who had greasy grey hair, facial hair, no facial scars, and whose right eye, to David's best recollection, was almost completely white. His assailant wore brown leather or plastic loafers. The evidence established that Larry Youngblood is a thirty-year-old black male who has dry black hair, a scar on his forehead and a bad left eye. He wears cloth-laced shoes and walks with a noticeable limp due to a foot injury received in an automobile accident when he was a child. He always wears glasses in public.

After attempting to persuade David to get into the car, the assailant grabbed him, threw him into the car and held him by his hair, continually pushing his head down on the floorboard, while driving away. Country music was playing on the radio. At some point, the assailant stopped the car near a ravine or wash and fondled and molested David. He then took David to an unidentified, sparsely furnished house where he sodomized him four times. He threatened to kill David if David told anyone about the incident. He also told David during the acts of anal intercourse that David was "too small," that the assailant had done this with his nephew so many times that his nephew's anus "was already stretched out." Later, he used a jumper cable to start the car and returned David to the carnival. The episode lasted about an hour and a half.

David was taken to Kino Hospital. Hospital personnel used a sexual assault kit to preserve evidence of the molestation. The kit included a tube for collecting a blood sample, a paper to collect a saliva sample, microscopic slides used to make smears (for female victims) and a set of swabs used to collect evidence. In this case, rectal and throat smears were made, and samples of the victim's blood and saliva were taken. The state's criminalist found evidence of semen present on the rectal smear. He did not attempt to quantify the amount of semen on the swab until a year after the assault had occurred. At that point he found no blood group substances on the swabs.

In addition, David's clothing was taken as evidence. The clothing was never refrigerated, and no testing was done until 15 months after the assault. Semen was found on the clothing, but no blood group substances were found on the underwear or the tee shirt stains. Samples of David's hair were taken to compare with any evidence found in Youngblood's car.

David described the assailant's car as a medium-sized, two-door sedan with a trashy interior and a noisy muffler. He testified that the car started with an ordinary ignition key. He also testified that there were blankets or sheets on the seats of the car but that he was not able to see them because the car was dark. The car radio was playing country music. The assailant told David the right passenger door did not work. About a month following the assault, David was brought to the police station to look at two blankets which he was told were taken from the assailant's car. Without touching them, he identified the blankets as those which were in the car.

Six weeks following the assault, the police seized Larry Youngblood's 1964 white, four-door Chrysler Imperial from the home of Alice Whigham, his former girlfriend, took it from her back yard where it was inside a chained gate, towed it to the station, took pictures of the car and dusted it for fingerprints. It was also examined for clothing and hair fibers. Because Youngblood had not transferred title to his name when he acquired the car, the police disposed of the vehicle without notice to Youngblood or defense counsel. Prior to this time, they did not determine whether the radio worked, if the ignition switch worked with a key, what station the radio was tuned to, if the muffler was noisy, or indeed whether the car was running at all.

Youngblood and others testified that his car was not running at the time of the incident because of electrical problems and because it needed other repairs. He further testified that he had removed the bat-

tery from his car to put in Alice Whigham's car. The car ran quietly when it was functioning and did not start with a key but with a screwdriver. The radio had not worked at all since he owned the car. The examination of the car failed to reveal any fingerprints, hair or clothing fibers from David; the only fingerprints were those of Youngblood.

Nine days after the assault, a police detective came to David's school, took a taped statement from him, told him they had arrested the man who raped him, and asked him to pick the assailant out of a photographic lineup. Three of the photographs had the left eye whited out, and three had the right eye whited out. David's optometrist testified at trial that David had an astigmatism and "was instructed to wear glasses whenever he was in school [or] doing close work, [or watching] T.V." He was not wearing glasses the night of the incident nor when he first viewed the photographic lineup. After looking at the pictures by holding them very close to his face, David picked Youngblood as his assailant, saying he was "pretty sure." Later, David identified another man in the lineup as the possible assailant.

Alice Whigham testified that on the night of the assault she had been at her mother's house until 9:30 p.m. preparing for her sister's birthday. When she returned home, the 10:00 o'clock news was coming on the television, and Youngblood was asleep on the living room sofa. Her house is a 30 to 45–minute drive from the place where David was abducted. The police interviewed Whigham four or five weeks after the incident. They woke her up at 4:00 a.m. and began asking her if she knew where Larry had been "around Halloween." She responded that he was not with her that night but that he was living there at the time. When Whigham later learned the actual date of the incident, she made several calls to the police department and defense counsel to tell them that Youngblood had been with her that night. Those calls were never returned. Youngblood testified that he was living with Alice at the time of the incident.

In the original appeal, we reversed Youngblood's convictions and dismissed the case. *State v. Youngblood,* 153 Ariz. 50, 734 P.2d 592 (App.1986). Following the Arizona Supreme Court's denial of the state's petition for review, the United States Supreme Court granted certiorari and reversed our decision. On remand, we ordered supplemental briefs.

## FAILURE TO PRESERVE SEMEN SAMPLES

In *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988), the Supreme Court held, regarding the Due Process Clause of the federal constitution, that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The state argues that the new *Youngblood* rule ends the inquiry. We disagree because the Due Process Clause of the Arizona Constitution provides greater protection than its federal counterpart. Ariz. Const. art. 2, § 4.

In *State v. Mitchell,* 140 Ariz. 551, 683 P.2d 750 (App.1984), this court held that law enforcement officers have a duty to preserve semen samples in a rape case, including refrigerating them. Our decision relied on *Scales v. City Court,* 122 Ariz. 231, 594 P.2d 97 (1979), holding that due process requires that the state must preserve breathalyzer samples in DUI cases. Our supreme court has since made it clear that this right to assistance from the state in gathering and preserving potentially exculpatory evidence is grounded in the Due Process Clause of the Arizona Constitution. *Montano v. Superior Court,* 149 Ariz. 385, 719 P.2d 271 (1986). In *Montano,* our supreme court stated:

While the state normally has no obligation to aid a suspect in gathering potentially exculpatory evidence, *see State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061 (1977), the unique evidentiary circumstances attendant to DWI arrests justify a narrow exception. The Due Process clause of the Arizona Constitution guarantees to DWI suspects "a *fair*

*chance* to obtain independent evidence of sobriety essential to his defense at the only time it [is] available." *Smith v. Ganske,* 114 Ariz. 515, 517, 562 P.2d 395, 397 (App.1977) (emphasis added). Where, as here, the only objective evidence is inherently evanescent, is virtually dispositive of guilt or innocence, and collecting the evidence places only a slight burden upon the state, due process requires that a suspect be informed of his right to gather the evidence prior to its dissipation.

*Montano v. Superior Court, supra,* 149 Ariz. at 389, 719 P.2d at 275. The semen evidence in this case is "inherently evanescent, is virtually dispositive of guilt or innocence,[1] and collecting the evidence places only a slight burden upon the state." Unless, therefore, there is a difference between semen and blood alcohol, and we see none, we are compelled to find that Youngblood has been denied due process. We believe that Arizona case law regarding the preservation of evidence and the effect of evidence destruction is rooted in the Arizona Constitution and is not dependent upon federal law.

█ Having determined that Youngblood is entitled to due process protection regarding the preservation of evidence, including a duty to preserve and refrigerate semen samples, *State v. Mitchell, supra,* we find that the state violated those rights in this case and, as a result, that Youngblood was deprived of a fair trial.

In this case, the state has not disputed the potentially exculpatory value of the lost evidence. As we stated in our first opinion:

> Both criminalists who testified in this case agreed that the P–30 test or the acid phosphate test might have exonerated Youngblood. The testing is done for two reasons: it verifies that sexual contact has occurred and also attempts to narrow the number or to exclude certain persons as suspects. The initial testing (ABO typing) on the rectal swab for blood group substances (found in certain persons who secrete the substances into their body fluids) showed that the criminalist was unable to find any blood group types. Both experts indicated that two equally possible alternatives would account for this. One was that the semen donor was a nonsecreter. That alternative would have eliminated Youngblood as the semen donor since he was analyzed and found to be an A secreter. The second alternative was at best neutral in relation to Youngblood's defense. It was that the secreter was of unknown blood type, because the sample was insufficient to determine the type. If the P–30 or the acid phosphate test had been performed, and the results showed there was a sufficient quantity of semen, then Youngblood could have been excluded. Even if the test results did not completely exonerate Youngblood, the criminalists agreed that they would have "considerably diminished the population of possible semen donors."

The deterioration of the semen sample was caused by the state's inaction in two areas: 1) the inability to quantitatively test the rectal swab and 2) the failure to properly preserve the "better sample," the stains taken from the victim's clothing. As the evidence showed, the samples taken from the clothing would have contained more semen than the rectal swab because of "natural drainage and leakage." The testimony also showed that since samples on clothing dry more quickly, there would be less chance for deterioration because of moisture. Additionally, there would be less contamination with either vaginal fluid or material from the rectum. The state's criminalist failed to refrigerate or freeze the clothing and failed to test the clothing for 15 months following the assault. When he ran the P–30 test, a quantitative test, he found the sample to be very small. He

---

**1.** At the time the evidence was obtained in this case, blood group testing was not as sophisticated as it was at the time of trial or as it is today. Nonetheless, proper testing at that time might well have eliminated Youngblood as a suspect. In addition, a rule of law ought to reflect present conditions and to impose a clear duty on officers to preserve critical evidence without allowing future litigation over just how dispositive the evidence will be.

was also unable to determine any blood groupings.

153 Ariz. at 54, 734 P.2d at 596. We agree with the dissent in *Arizona v. Youngblood* that this type of evidence, which a reasonable police officer should know "has the potential, if tested, to reveal immutable characteristics of the criminal, and hence to exculpate a defendant charged with the crime," 488 U.S. at 69, 109 S.Ct. at 343, 102 L.Ed.2d at 297, was not only relevant, *see Hilliard v. Spalding*, 719 F.2d 1443 (9th Cir.1983), but in this case there was no other comparable evidence available to Youngblood.

Under the circumstances of this case, it is clear that Youngblood's convictions must be reversed and the charges dismissed.

## DESTRUCTION OF CAR

■ A second and separate ground argued by Youngblood for reversing his convictions is the state's inexplicable destruction of Youngblood's car without notice to him. We did not reach this issue in our first opinion; we do so now. As we mentioned in our first opinion, criminal rule 28.2(e), governing the disposition of evidence in the custody of the state following the adjudication of charges, requires 10 days' notice "to any person, and his counsel against whom the item has been or may be used as evidence." Ariz.R.Crim.P. 28.2(e), 17 A.R.S. *See also State v. Superior Court*, 127 Ariz. 175, 619 P.2d 3 (1980). The parties' stipulation that the car was impounded, later released to the towing company and then dismantled because the registered owner (not Youngblood) did not claim it, does not affect Youngblood's right to notice under the rule. The state offers no reasonable explanation for the destruction of the car which was towed from the home of a friend with whom Youngblood had been living for several months, or why it was never checked to see if the radio worked, or what station it was tuned to, or whether the ignition switch operated with a key. The reasonable implication is that the state recognized the exculpatory value of the car, having found no evidence of the victim's having been in the car.

This, in fact, is what defense counsel argued to the jury, bolstered by the giving of a *Willits* instruction. Youngblood's tactic at trial, instead of making a motion to dismiss based upon the rule violation, was to argue the rule violation to the jury in order to create a reasonable doubt. In addition, the pictures of the car were also seen by the jury, which supported Youngblood's claim that the car did not start with an ignition key. This tactical decision, in addition to the type of evidence claimed to have been destroyed with the car, leads us to conclude that its destruction without notice to Youngblood did not result in a due process violation. The seizure of the car six weeks after the incident raises considerable questions about its probative value because Youngblood would have had difficulty proving that its condition had not changed. Based upon this record, we find Youngblood was able to argue the car's exculpatory value to the extent possible despite its destruction. Therefore, we find no due process violation as a result of the loss of this evidence.

In our first decision, we examined at length the prejudice to Youngblood's defense caused by the state's failure to preserve for testing the best evidence, the victim's clothing, and its delay in testing the samples taken. Were we to decide that Youngblood was entitled to a new trial because of this violation, we would also point out, as an alternative ground, his trial counsel's actions in the second trial.

The first trial ended in a mistrial because of a hung jury. However, at the second trial, counsel failed to call certain defense witnesses, including Youngblood's sister, his psychiatric social worker, and his psychiatrist, even though she knew of their existence, until after Youngblood had been convicted and after she had filed a motion to vacate judgment, in which she sought withdrawal because of a possible ineffective assistance of counsel claim. She then paraded all of these witnesses before the trial judge at Youngblood's mitigation

hearing.[2]

The trial judge was puzzled, as are we, as to why she chose to present this testimony after he had been convicted. We believe her actions present a colorable claim for ineffective assistance of counsel. *State v. Carver*, 160 Ariz. 167, 771 P.2d 1382 (1989). However, we are precluded from reaching this issue absent an evidentiary hearing. *Id.*

However, we need not reach that issue because we find that Youngblood's case requires dismissal. The evidence destroyed by the state, specifically the semen samples, is gone forever. He can no longer get a fair trial on these charges. This is not a case of harmless error, where the evidence against the accused was otherwise overwhelming. Nor is this a case, as noted above, where the "evidence against the defendant is so strong that a court can say beyond a reasonable doubt that the destroyed evidence would not have proved exonerating." *State v. Escalante*, 153 Ariz. 55, 61, 734 P.2d 597, 603 (App.1986).

The convictions are reversed.

FERNANDEZ, C.J., and LIVERMORE, P.J., concur.

---

**2.** Phyllis Kaczmarski, a psychiatric nurse whose counseling practice included both victims and perpetrators of sexual crimes, had worked with Youngblood for two years and was counseling him in October, 1983. She testified that Youngblood was diagnosed as suffering from chronic paranoid schizophrenia but that his condition around the time of the molest was very good and that he was taking his prescribed medication. She stated that there was nothing in her counseling sessions or from Youngblood's history to indicate he was capable of being a child molester. Youngblood's sister and her two sons testified that he never had any grey hair, that he normally wore dark glasses, and that he never listened to country music.

Dr. Scappa, Youngblood's psychiatrist from 1979 to 1982, also testified. He first corroborated the testimony concerning the color of hair, the glasses, the dislike of country music and that Youngblood's car radio had never worked when he knew him. He stated that, based on his personal knowledge of Youngblood's history and his firm diagnosis of paranoid schizophrenia with "very, very little evidence of sociopathy," he was not capable of proceeding through or completing such an act. Dr. Scappa found consistent the test results of a psychological evaluation done in March 1985, showing no information which suggested sexual deviancy.