857 P.2d 400

**Louis B. MOSS, and Kenneth McElwain, Petitioners,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF LA PAZ, the Honorable Michael Irwin, a judge thereof, Respondent Judge,**

**Steven P. SUSKIN, La Paz County Attorney, Real Party in Interest.**

**No. 1 CA–SA 93–0111.**

Court of Appeals of Arizona, Division 1, Department D.

July 29, 1993.

Michael J. Burke, Public Defender, Parker, for petitioners.

Steven Suskin, La Paz County Atty., Parker, for real party in interest.

Richard M. Romley, Maricopa County Atty. by Mark K. Ainley, Deputy County Atty., Phoenix, for amicus curiae.

OPINION

GRANT, Judge.

Defendants below, Louis B. Moss and Kenneth McElwain, petition for special action relief, asserting that the trial court's denials of their motions to suppress Intoxilyzer test results taken after their arrests for aggravated driving while under the influence of intoxicating liquor ("DUI") constituted denial of due process of law. This special action challenges the constitutionality of Ariz.Rev.Stat.Ann. ("A.R.S.") section 28–692(G) and (H). We uphold the constitutionality of the statute which states that a defendant need not be given a preserved breath sample following replicate breath testing for DUI.

This court has jurisdiction to consider this special action pursuant to A.R.S. section 12–120.21(A)(4) and Rules 4(a) and 7(a) of the Arizona Rules of Procedure for Special Actions.

*FACTS AND PROCEDURAL HISTORY*

The relevant facts, taken from the parties' briefs as well as portions of the transcript of the evidentiary hearing of February 26, 1993, are the following.

At approximately 6:00 p.m. on November 6, 1992, Louis B. Moss ("Moss") was stopped by Department of Public Safety ("DPS") Officer Joe Deschaine ("Officer

Deschaine"), after Officer Deschaine observed Moss's car weaving within its lane and crossing the center lane several times into the path of oncoming traffic. When Officer Deschaine spoke with Moss he detected a strong odor of alcohol. A driver's license check produced the information that Moss's driving privileges were suspended and revoked as a result of prior violations of A.R.S. section 28–692(A)(1). Moss submitted to field sobriety tests. Based on his performance on those tests and on his driving, Moss was taken to the DPS office in Parker, Arizona. At the DPS office, Moss submitted to replicate [1] tests of his breath on an Intoxilyzer 5000, which had no second sample collection device. The results of the tests indicated that Moss had a blood alcohol concentration ("BAC") of .147 and .150.

No sample of Moss's breath was captured or preserved by DPS or offered to Moss for independent analysis. However, prior to submitting to the breath tests, Moss was advised of his implied consent rights, was read the Duplicate Breath Test Advisory, and was given a form to sign that advised him that after completing the breath tests, he would be given a reasonable opportunity to arrange for independent testing. Moss signed the form prior to submitting to the tests, but apparently never asserted his right to any independent tests. He was subsequently transported to the La Paz County Sheriff's Office where he was charged with DUI on a suspended or revoked license while having a BAC of .10 or more in violation of A.R.S. sections 28–692(A)(1) and (A)(2).

At approximately 12:10 a.m. on November 7, 1992, DPS Officer Steve Tritz ("Officer Tritz") stopped Kenneth McElwain ("McElwain") after he observed McElwain's car weave within the roadway and then stop and reverse direction to avoid Officer Tritz after Officer Tritz had pulled his police car in behind McElwain's car. When Officer Tritz spoke to McElwain, he noted that McElwain had watery, bloodshot eyes and detected an odor of alcohol. McElwain admitted to Officer Tritz that he had consumed two or three beers. Officer Tritz administered field sobriety tests. Based on McElwain's performance on the tests and on his driving, McElwain was arrested.

During an interview with Officer Tritz, McElwain admitted to having been arrested for DUI earlier in the year. He also acknowledged that he was aware that he was currently driving with a suspended license. A check run by Officer Tritz through DPS produced the information that McElwain's license had been revoked on October 15, 1992; that a suspension of his privilege to drive was placed from October 13 through November 12, 1992, and restricted from October 19 through December 8, 1992; and that he had two prior convictions for DUI in 1992.

McElwain was also subjected to replicate breath tests on an Intoxilyzer 5000. His tests registered a BAC of .137 at 1:01 a.m. and a BAC of .121 at 1:08 a.m. As with Moss, no additional sample of McElwain's breath was captured or preserved or offered to him for independent testing. Prior to administering the replicate tests, McElwain was also advised of his implied consent rights, read the Duplicate Breath Test Advisory and was given a form that informed him that, after completing the breath tests, he would be given a reasonable opportunity to arrange for an independent testing by a physician, registered nurse or other qualified professional of his own choosing. Like Moss, McElwain signed the form before submitting to the breath tests but did not assert his right to independent testing. He too was ultimately transported to the La Paz County Sheriff's Office and charged with DUI.

Moss filed a motion to suppress the results of his breath tests, contending that failure to provide him with a sample of his breath for independent testing violated his

---

1. "Replicate breath testing is a series of two consecutive breath tests spaced by air blanks to flush out the sample chambers. A reading is taken of each of the two samples and the variance between the two samples must be within .02 [BAC] for the test to be valid." *State ex rel., Dean v. City Court,* 163 Ariz. 510, 511 n. 2, 789 P.2d 180, 189 n. 2 (1990).

due process rights. McElwain joined in Moss's motion to suppress. Following an evidentiary hearing in La Paz County Superior Court the motions to suppress were denied. In individual orders filed on March 8, 1993, the trial court found that A.R.S. sections 28–692(G) and (H), the regulatory procedures adopted to implement the statute and the replicate testing procedures met the due process requirements of the Arizona Constitution and that each defendant was afforded reasonable opportunity to obtain independent testing.

Defendants then filed this special action asking this court to reverse the trial court's denial of the motions to suppress and to find that A.R.S. section 28–692(G) and (H) violates due process and equal protection guarantees of the United States and Arizona Constitutions. Defendants also argue that they did not waive their rights to additional independent tests under A.R.S. section 28–692(H) but that no "reasonable opportunity" to obtain independent tests was afforded them.

The state also asks us to accept jurisdiction of this special action. The state argues that the statutory procedures established by A.R.S. section 28–692(G) and (H) and by the Department of Health Services rules promulgated in accordance with that statute have significant statewide impact on law enforcement officers and defendants in DUI cases. The state urges us to take jurisdiction in the interests of judicial economy to ensure the prompt determination of the constitutionality of A.R.S. section 28–692(G) and (H) and to avoid a backlog of cases brought under the newly enacted statute.

The Maricopa County Attorney's Office has filed an *amicus* brief in which it joins in the response filed by the La Paz County Attorney's Office urging us to accept special action jurisdiction to resolve the question of the constitutionality of the statute.

The issue of the constitutionality of newly enacted A.R.S. section 28–692(G) and (H), is one of statewide importance affecting numerous cases. *State v. Velasco*, 165 Ariz. 480, 482, 799 P.2d 821, 823 (1990). Additionally, it is an issue of first impres-

sion that turns on a question of law justifying special action jurisdiction. *Vo v. Superior Court*, 172 Ariz. 195, 198, 836 P.2d 408, 491 (App.1992).

By order we accepted jurisdiction and denied relief, indicating that an opinion would follow. This is that opinion.

## DISCUSSION

First, we note that at least one of these cases is before us as the result of a "test case" established by the Arizona Department of Public Safety in La Paz County to test the constitutionality of new A.R.S. section 28–692(G) and (H).

In each of these cases, no argument was made that the breath tests were improperly administered or that proper testing procedures, such as the "deprivation period" required by Department of Health Services rules, were not followed by DPS. Nor did any arguments call into question the functioning of the Intoxilyzer 5000 or the accuracy of the test results obtained. For purposes of this opinion, therefore, we assume that the reliability of the machines—and thus of the test results in this case—is without question.

(1) *Constitutionality of A.R.S. Section 28–692(G) and (H)*

Defendants challenge the constitutionality of A.R.S. section 28–692(G) and (H), as enacted by the legislature on September 30, 1992. The newly enacted statute eliminated the state's duty to provide DUI suspects with samples of their breath for independent testing when replicate breath tests are performed. The statute requires only that a reasonable opportunity to arrange for an independent test at a suspect's own expense be provided. The challenged statute reads as follows:

*A.R.S. section 28–692*

(G) If a law enforcement officer administers a duplicate breath test and the person tested is given a reasonable opportunity to arrange for an additional test pursuant to subsection H of this section,

a sample of the person's breath does not have to be collected or preserved.

(H) The person tested shall be given a reasonable opportunity to arrange for any physician, registered nurse or other qualified person of his own choosing to administer a test or tests in addition to any administered at the direction of a law enforcement officer. The failure or inability to obtain an additional test by a person shall not preclude the admission of evidence relating to the test or tests taken at the direction of a law enforcement officer.

Defendants contend that the elimination of the requirement that the state capture and preserve an additional sample of a DUI suspect's breath for independent testing deprives suspects of due process under both the United States and Arizona Constitutions. They argue that without secondary breath samples, they were deprived of a crucial source of evidence with which to attack the validity of the test readings and, therefore, of the statutory presumption of intoxication.

The state contends that, given the accuracy of replicate breath testing on the Intoxilyzer 5000, there is no longer a reason to provide suspects with samples of their breath for independent testing. According to the state, the safeguards established by the Quality Assurance Program monitored by the DPS, together with the technological sophistication of the Intoxilyzer 5000 and scientific advancements in the procedures for carrying out breath testing, adequately protect DUI suspects' due process rights. The state maintains that defendants were afforded due process because all of the procedures required by A.R.S. section 28–692(G) and (H) were followed. Furthermore, the state also maintains that breath samples do not provide the sole means by which DUI suspects may challenge the test results. The state relies on the U.S. Supreme Court's decision in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), to argue that defendants may effectively challenge the results of breath tests by showing that the Intoxilyzer used was miscalibrated; that extraneous forces, such as radio waves, interfered with the machine's measurements; or that operator error was involved.

Our supreme court has addressed the issue of whether due process requires the state to capture and preserve a sample of a DUI defendant's breath for independent testing on numerous occasions. *See Scales v. City Court*, 122 Ariz. 231, 594 P.2d. 97 (1979); *Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979); *Montano v. Superior Court*, 149 Ariz. 385, 719 P.2d 271 (1986); *State ex rel. Dean v. City Court*, 163 Ariz. 510, 789 P.2d 180 (1990); and *State v. Velasco*, 165 Ariz. 480, 799 P.2d 821 (1990). Through those cases, the current view emerged that due process imposes a duty on the state to capture and preserve a sample of the DUI suspect's breath for independent testing by the suspect, unless the suspect specifically waives any right to such a sample. In previous cases, the supreme court was concerned with striking a fair balance between affording DUI suspects a genuine opportunity to defend themselves against the charges without adding pointlessly to the state's prosecutorial burdens. The cases give the impression that the supreme court's decisions requiring defendants to be provided with breath samples was based as much on the conclusion that providing a sample was easy for the state to do as it was on the objective determination that a breath sample would provide truly exculpatory evidence. *See Baca*, 124 Ariz. at 355, 604 P.2d at 619, *citing with approval, Garcia v. District Court, 21st Judicial District*, 197 Colo. 38, 589 P.2d 924, 929–930 (1979) (failure of the state to collect and preserve evidence, *when those acts can be accomplished as a mere incident* to a procedure routinely performed by state agents, is tantamount to suppression of that evidence) (emphasis added); *Montano*, 149 Ariz. at 389, 719 P.2d at 275 (where the only objective evidence is inherently evanescent, is virtually dispositive of guilt or innocence, *and collecting the evidence places only a slight burden upon the state*, due process requires suspect to be informed of right to gather evidence prior to its dissipation)

(emphasis added); *Velasco*, 165 Ariz. at 489, 799 P.2d at 830 (principles of fundamental fairness do not permit police to knowingly destroy or dissipate that which they systematically obtain for their own testing and evidentiary use, especially when they may keep such evidence without any significant burden and are aware the evidence may be of value to the defense). In *State ex rel. Dean*, the supreme court acknowledged that the state is not obligated to assist a suspect in gathering potentially exculpatory evidence. 163 Ariz. at 513, 789 P.2d at 183.

None of these earlier cases involved the issue of whether due process required preserving an independent sample when replicate testing with the Intoxilyzer 5000 was used pursuant to the currently established procedures for primary testing of DUI suspects. While the situation was foreshadowed in *Velasco*, the supreme court left its resolution, as well as whether such a scenario might lead the court to revise its opinion from earlier cases, for another time:

> ... the state argues that replicate testing using an Intoxilyzer is so fundamentally reliable and accurate that concepts of fundamental fairness would require nothing further and no independent sample would be needed.... Although the state may well be correct in arguing that due process does not require an independent sample when the primary test consists of replicate testing on the Intoxilyzer, we will leave decision on that issue to the day it is presented.

165 Ariz. at 489, 799 P.2d at 830. This is that day.

Given the reliability and accuracy of replicate testing with an Intoxilyzer 5000, we do not believe that due process or fundamental fairness requires the state to provide defendants with breath samples. In light of the acknowledged technological development of the Intoxilyzer 5000, the focus inherently shifts from the breath sample to the machine itself and its proper operation for the due process debate to be relevant. We agree with the United States Supreme Court in *Trombetta* that defen-dants' due process rights are not violated by denying them independent samples, since defendants still have sufficient means of raising a meaningful challenge to the test results.

As the technological development of the testing equipment used increases in sophistication and, concomitantly, in reliability—from the Breathalyzer use in *Scales* to the GCI Mark IV Intoximeter used in *Baca* to the Intoxilyzer 5000 used in *Dean* and *Velasco*—the demonstrable value of an extra breath sample as the unique means of impeaching test results correspondingly wanes in inverse proportion. In *Scales*, for example, where test results employing a Breathalyzer were based on a comparison of a "reference ampoule" wherein no breath had been introduced against a similar ampoule containing a similar chemical solution to the reference ampoule into which a suspect's breath had been blown, the evidence showed that there was much to be learned from an actual physical examination of the test ampoule of defendant's breath:

> The evidence presented shows that if the volume in the ampoule is less than three milliliters the test results will be elevated. Each ampoule must contain an exact amount of potassium dichromate and a variance in this amount can render the test invalid. Any imperfections in the glass or foreign substance on the glass could cause diffusion of the light passing through the ampoule and could cause an incorrect test reading. This is especially true when a test ampoule is moved after being balanced with the reference ampoule. Any foreign substance composed of hydrocarbons inside the test ampoule would react with the chemicals within and produce a reaction similar to their reaction with alcohol.

122 Ariz. at 233, 594 P.2d at 100. By the time of *Velasco* and the use of Intoxilyzer 5000, technology had progressed to such a degree that built-in safeguards in the machine made an additional sample almost superfluous:

> ... the Model 5000 Intoxilyzer ... used in this case (and the one most commonly

used), has a number of mechanisms intended to guarantee the accuracy and reliability of test results. The device gives the operator step-by-step instructions on proper operation and invalidates the test if it is incorrectly administered. The device protects itself against radio frequency interference and can also detect and report chemical interference. The machine can detect mouth alcohol and invalidates the test when it does. Finally, the instrument will indicate when the breath sample is deficient for lack of deep lung air. Given these safeguards, plus the regulatory safeguards ... Intoxilyzer test results are considered extremely accurate.

165 Ariz. at 485, 799 P.2d at 826. In *Velasco*, while suggesting that replicate testing might justify another outcome, our supreme court nonetheless decided to provide the defendant with an additional sample because it was readily available. At the same time, the *Velasco* court observed that due process does not require the police to prepare the defendant's case and to collect and preserve evidence for the defendant, 165 Ariz. at 489, 799 P.2d at 829.

The Intoxilyzer 5000 is a very accurate and reliable testing method with built-in safeguards. The test is more accurate than the independent test methods used to analyze the silica gel sample or secondary sample. *Velasco*, 165 Ariz. at 485, 799 P.2d at 826. For these reasons we hold that due process does not require defendants to be provided with an additional sample when replicate breath tests are administered. The state presented evidence to show that when duplicate tests are conducted according to the testing protocol established by the DPS regulations and the statutes—that is, consecutive, quantitative, evidentiary tests administered five to ten minutes apart with .020 or better agreement—"virtually any chance of contamination by mouth alcohol" is eliminated. Furthermore, the state reaffirmed the technical safeguards incorporated in the Intoxilyzer 5000, such as the "slope detector," which guards against the taint of mouth alcohol and insures that the breath tested derives from "alveolar or deep lung" samples; the "error logic recognition system," which guards against operator errors; and the "radio frequency interference detector," which safeguards against potential interference by electromagnetic transmissions. As the U.S. Supreme Court found in *Trombetta*, given the sophistication of the Intoxilyzer and of the DPS testing procedures, "chances are extremely low that preserved samples would [be] exculpatory." 467 U.S. at 488, 104 S.Ct. at 2533.

Concepts of due process and fundamental fairness require only that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 484, 104 S.Ct. at 2532. The increased accuracy and reliability of replicate testing on the Intoxilyzer 5000 is one basis for our determination that additional (referee or secondary) breath samples no longer add anything "meaningful" to the opportunity to present a defense.

Therefore, we hold that due process does not require the state to provide DUI defendants with a separate additional breath sample for independent testing when replicate tests on an Intoxilyzer 5000 are employed as prescribed by the DHS and DPS regulations. Our decision is in accord with that of Division 2 on this issue in *State v. Rodriguez*, 173 Ariz. 450, 844 P.2d 617 (App.1992).

Although the instant opinion may appear at first blush to be contrary to the recent opinion of this court in *State v. Vannoy*, ── Ariz. ──, ── P.2d ──, 137 Ariz.Adv. Rep. 36 (App. April 22, 1993), we do not view our opinion today as contradictory. In *Vannoy*, we only decided that the state must provide a breath sample to a defendant charged with DUI when the defendant has given a *deficient* sample in the breath test but the state still uses the results at trial. Additionally, the challenged statute in the instant case was not yet enacted at the time of *Vannoy*.

Furthermore, we agree with *Trombetta* that "the evidence to be presented at trial [is] not the breath itself but rather the Intoxilyzer results obtained from the

breath samples." 467 U.S. at 488, 104 S.Ct. at 2533. Thus, like the *Trombetta* court, we find that DUI suspects continue to have the means of impeaching even Intoxilyzer 5000 results by showing calibration errors, operator errors, however slight, and/or extraneous conditions, such as dieting or medical treatment, that might affect the outcome of testing for individual defendants.

We hold that the trial court correctly found that the provisions of A.R.S. section 28–692(G) and (H) did not violate defendants' due process rights under either the United States or Arizona Constitutions.

(2) *Additional Testing Provisions*

We do not reach the issue of whether defendants in this case were provided a "reasonable opportunity" to obtain independent tests. The defendants ask this court to speculate that they would not have been afforded a reasonable opportunity to have an independent secondary test performed had they so requested. Since they did not ask, we will not speculate.

### CONCLUSION

For the reasons stated above, we conclude that the provisions of A.R.S. section 28–692(G) and (H) do not deprive DUI defendants of their due process rights under either the United States or Arizona Constitutions. Preserved breath samples given to a defendant no longer provide a "meaningful" mode of impeaching blood alcohol test results, since those samples' ability to furnish exculpatory evidence is so extremely low as to be inconsequential in light of the technological safeguards incorporated into the Intoxilyzer 5000 machine and the DHS testing procedures under the Arizona statutes. These scientific advancements in the technology of breath testing do not deprive defendants of the means to mount a meaningful defense. Defendants may still appropriately challenge the results obtained from a breath sample by means other than by a preserved secondary or referee breath sample.

The trial court's judgment is affirmed.

McGREGOR, P.J., and WEISBERG, J., concur.