46 P.3d 1074

**The STATE of Arizona, Appellant,**

v.

**Terry Lynn O'DELL; Marcos T. Poblete; William W. Morgan; Miguel Canedo Avilez; Ike Paul Jimmerson; Freddy E. Martinez; Eugene A. Vasquez; Rigoberto Lujan, Jr.; and Reginald C. Johnson, Appellees.**

Nos. 2 CA–CR 2001–0031, 2 CA–CR 2001–0163, 2 CA–CR 2001–0164, 2 CA–CR 2001–0166, 2 CA–CR 2001–0167, 2 CA–CR 2001–0168, 2 CA–CR 2001–0169, 2 CA–CR 2001–0177, 2 CA–CR 2001–0190.

Court of Appeals of Arizona, Division 2, Department B.

May 30, 2002.

---

1. A.R.S. § 13–4401(18) is now renumbered as § 13–4401(19)(2001).

Barbara LaWall, Pima County Attorney, by Elizabeth Hurley and Bradley Roach, Tucson, for Appellant.

Susan A. Kettlewell, Pima County Public Defender, by Dean J. Brault, Tucson, for Appellees O'Dell, Poblete, Morgan, Avilez, Jimmerson, Martinez, Lujan, and Johnson.

Zohlmann Law Offices, by Robert J. Zohlmann, Amado, for Appellee Vasquez.

## OPINION

HOWARD, Presiding J.

¶ 1 The superior court dismissed with prejudice charges of driving under the influence of an intoxicant (DUI) and driving with a blood alcohol content (BAC) of .10 or more against appellees, Terry L. O'Dell; Marcos T. Poblete; William W. Morgan; Miguel C. Avilez; Ike P. Jimmerson; Freddy E. Martinez; Eugene A. Vasquez; Rigoberto Lujan, Jr.; and Reginald C. Johnson (collectively "O'Dell"), after consolidating their cases. The court found that the state's failure to preserve and disclose memory data from the intoxilyzer used to determine their BAC violated Rule 15.1, Ariz.R.Crim.P., 16A A.R.S., the federal and state due process clauses, and the requirement of statewide uniformity for BAC testing. Because the record fails to support the superior court's factual findings and because we disagree with its conclusions of law, we vacate the trial court's order of dismissal and remand for further proceedings.

## FACTUAL BACKGROUND

¶ 2 We view the facts in a light most favorable to sustaining the trial court's dismissal. *State v. Rasch*, 188 Ariz. 309, 312, 935 P.2d 887, 890 (App.1996). The state uses the Intoxilyzer 5000 to test DUI suspects' breath for the presence of alcohol. Before and after a completed breath test of any DUI suspect, the intoxilyzer automatically runs "concurrent" calibration checks to test its own accuracy. To operate, the machine also requires that two individual breath measurements, or "subject tests," be taken between five and ten minutes apart, with results that are within .02 of each other. Additionally, every thirty-one days a routine calibration test is conducted, and every ninety days a quality assurance test is conducted. Further, the state keeps a service log for repairs to the intoxilyzer. If the intoxilyzer detects an error on a subject test, it "flags" the error and prints a card reporting the error, and the suspect is retested. After each completed breath test, the suspect is given a breath test card printed from the intoxilyzer's memory, which includes results from both subject tests and the concurrent calibration tests. The suspect is also provided with the results of the thirty-one-day calibration testing and ninety-day quality assurance testing.

¶ 3 Unlike earlier models of intoxilyzers, which contained only enough memory to store data from a single completed test so that the breath card could be printed, the Intoxilyzer 5000 has sufficient memory to retain data from multiple completed breath tests, calibration checks, and quality assurance procedures, as well as other data. Its memory, however, can store data from only one hundred completed breath tests. And, when the memory is full, new data begins to overwrite the oldest data.

¶ 4 Police can electronically transfer the data from the memory through dedicated telephone lines and a modem to Arizona Department of Public Safety (DPS) computers in Phoenix crime laboratories equipped with the Alcohol Data Acquisition Management

System (ADAMS), a software database and communication package. After being transferred, the data can be sent to an Arizona Criminal Justice System mainframe computer, where it could be accessible to DUI defendants as an ADAMS report. While some law enforcement jurisdictions in the state routinely transfer the Intoxilyzer 5000 data and provide ADAMS reports to DUI defendants, Pima County has not installed the modem required to connect with the DPS mainframe and does not transfer the data. Therefore, although DUI defendants in Pima County have access to the paper records from their respective breath tests, the state cannot provide them access to ADAMS data from any other breath tests.

## PROCEDURAL BACKGROUND

¶ 5 O'Dell and the other appellees were charged in Pima County Superior Court with DUI and/or driving with a BAC of .10 or more.[1] The state disclosed O'Dell's breath test card, which included the concurrent calibration checks and O'Dell's test results, and also disclosed results from the thirty-one-day calibration checks and the ninety-day quality assurance test. However, in keeping with routine procedure, the intoxilyzer memory, which contained data from O'Dell's breath test and other individual breath tests which preceded and followed O'Dell's, was not electronically transferred. Accordingly, this data was eventually overwritten in the intoxilyzer memory.

¶ 6 In a "Motion for Disclosure" filed pursuant to Rule 15.1, Ariz.R.Crim.P., and an additional motion for sanctions, O'Dell moved to suppress his breath test results and dismiss his case, arguing the state impermissibly had allowed the data in the memory of the intoxilyzer used for his breath test to be erased. The court consolidated the other appellees' cases with O'Dell's for the limited purpose of resolving this issue.[2] In his motions, O'Dell argued that his breath test results should be suppressed and his case dismissed because the intoxilyzer data was exculpatory and the state was required to disclose it under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He further argued that dismissal was required because the state had acted in bad faith in failing to preserve the data. The state responded that neither preservation nor disclosure of the data was necessary because it was not exculpatory. It also contested the claim of bad faith.

## TRIAL COURT'S RULING

¶ 7 After the hearing, the trial court, in its minute entry dismissing O'Dell's case, entered factual findings and legal conclusions,[3] including the fact that the intoxilyzer data was exculpatory "as a whole" and that the state had violated Rule 15.1, Ariz.R.Crim.P., and *Brady* in failing to preserve it. The court further concluded that dismissal was required under *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *State v. Youngblood*, 173 Ariz. 502, 844 P.2d 1152 (1993), because the state had acted in bad faith when it "intentionally or at least knowingly allowed evidence that is, in general terms, clearly exculpatory to be systematically destroyed." The state appeals the trial court's ruling.

¶ 8 "Generally, a trial court's ruling on a motion to dismiss the indictment or to suppress evidence will not be overturned absent an abuse of discretion." *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, ¶ 9 (App.2000). We defer to the trial court's

---

1. These DUI charges were filed in superior court because they were felony aggravated DUI or BAC charges, or they accompanied various felony charges such as aggravated assault.

2. Appellee Vasquez contends separately that, because the state did not file or serve on him a Notice of Appeal pursuant to Rule 31.3, Ariz.R.Crim.P., the state's appeal should be dismissed as to him. But the caption number for his case appeared on the court's judgment, and the state's timely filed Notice of Appeal included the judgment caption number for the consolidated case, thereby vesting jurisdiction in this court. *See State v. Smith*, 171 Ariz. 501, 503, 831 P.2d 877, 879 (App.1992). And, Rule 31.2(f)(2) imposes the duty of service on the clerk of the trial court. Finally, Vasquez has not claimed he was unaware of the state's appeal and has claimed no prejudice. *See Smith.* Accordingly, we reject his contention.

3. The trial court essentially adopted O'Dell's proposed findings of fact and conclusions of law.

factual findings unless clearly erroneous. *Mack v. Cruikshank,* 196 Ariz. 541, ¶ 6, 2 P.3d 100, ¶ 6 (App.1999). But we are not bound by its legal conclusions. *State v. Hackman,* 189 Ariz. 505, 508–09, 943 P.2d 865, 868–69 (App.1997). We also review any due process claims de novo. *Rosengren,* 199 Ariz. 112, ¶ 9, 14 P.3d 303, ¶ 9.

### RULE 15.1(e)

¶ 9 The trial court based the dismissal, in part, on Rule 15.1(e), Ariz.R.Crim.P., which provides as follows:

> Upon motion of the defendant showing that he or she has substantial need in the preparation of his or her case for additional material or information not otherwise covered by Rule 15.1, and that the defendant is unable without undue hardship to obtain the substantial equivalent by other means, the court in its discretion may order any person to make it available to him or her. The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive.

This rule does not, by its own terms, provide for dismissal. And the record in this case contains no prior order requiring any additional disclosure. Consequently, the trial court could not dismiss the case against O'Dell without having entered a prior order with which the state had failed or refused to comply.[4] *See* Rule 15.7, Ariz.R.Crim.P. (providing for sanctions for failure to disclose). Furthermore, although O'Dell moved for "disclosure" under Rule 15.1(e), the intoxilyzer data no longer existed, a fact that O'Dell acknowledged in his disclosure motion. Rule 15.1(e) simply cannot apply to evidence that no longer exists. Accordingly, the trial court improperly dismissed the charges under Rule 15.1(e).

### *BRADY*

¶ 10 The trial court further dismissed the charges pursuant to *Brady,* and under Rule 15.1(a)(7), Ariz.R.Crim.P., which codifies *Brady.* *See* Ariz.R.Crim.P. 15.1(a)(7), cmt. *Brady* is rooted in the due process clause and its purpose is to protect a defendant's "right to a fair trial by ensuring the reliability of the verdict against him." *United States v. Coppa,* 267 F.3d 132, 138 (2nd Cir.2001). Under *Brady,* the state is required to disclose all plainly exculpatory evidence within its possession and violates due process if it fails to do so, irrespective of its good or bad faith. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218; *see also Arizona v. Youngblood,* 488 U.S. at 57, 109 S.Ct. at 337, 102 L.Ed.2d at 289; *State v. Youngblood,* 173 Ariz. at 506, 844 P.2d at 1156.

¶ 11 As O'Dell stated in his motion for disclosure and as the court itself recognized, the state had not preserved the intoxilyzer data. Hence, the state did not violate *Brady* by failing to disclose evidence it no longer had. And the state had never possessed the data in any useable form. Moreover, the remedy for a *Brady* violation is a retrial, not dismissal, since *Brady* presupposes the exculpatory evidence still exists. *See State v. Youngblood,* 173 Ariz. at 506, 844 P.2d at 1156; *see also United States v. Dumas,* 207 F.3d 11, 15 (1st Cir.2000) (*Brady* addresses only "exculpatory evidence that is still in the government's possession"). Ultimately, neither *Brady* nor Rule 15.1(a)(7) supports dismissal in this case.

### *YOUNGBLOOD*

¶ 12 The trial court also dismissed the case pursuant to *Arizona v. Youngblood* and *State v. Youngblood,* which apply to cases in which the evidence in controversy no longer exists. Under such circumstances, due process is violated only if a defendant shows the state had acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood,* 488 U.S. at 57–58, 109 S.Ct. at 337, 102 L.Ed.2d at 289; *State v. Youngblood,* 173 Ariz. at 508, 844 P.2d at 1158. In the due process context, a determination of bad faith " 'must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' " *State v. Walker,* 185 Ariz. 228, 238, 914 P.2d 1320, 1330 (App.1995), *quoting*

---

4. The question of whether a trial court could order disclosure of the intoxilyzer memory under Rule 15.1(e) in any particular DUI case is not before us.

*Arizona v. Youngblood,* 488 U.S. at 56 n., 109 S.Ct. at 336 n., 102 L.Ed.2d at 288 n.; *see also State v. Dunlap,* 187 Ariz. 441, 452, 930 P.2d 518, 529 (App.1996) (state must preserve only evidence that could be expected to have significance in suspect's defense).

 ¶ 13 The mere possibility that destroyed evidence could have exculpated a defendant is insufficient to establish a due process violation, as there has been no showing of prejudice to the defendant. *Arizona v. Youngblood,* 488 U.S. at 56 n., 109 S.Ct. at 336 n., 102 L.Ed.2d at 288 n.; *State v. Youngblood,* 173 Ariz. at 507, 844 P.2d at 1157; *Walker,* 185 Ariz. at 238, 914 P.2d at 1330. If the state fails to preserve evidence that has not been tested and only might have been exculpatory, the evidence is not constitutionally material and no prejudice can be shown. *See Arizona v. Youngblood; State v. Youngblood.*

¶ 14 The trial court found that "data from the ADAMS system has proven that particular test results are unreliable where paper records indicated no problem with the reliability of the results." It concluded that the state therefore had acted in bad faith under *Arizona v. Youngblood* and *State v. Youngblood* by knowingly "allow[ing] evidence that is, in general terms, clearly exculpatory to be systematically destroyed."

### a. Flaxmayer Testimony

 ¶ 15 At the hearing, Chester Flaxmayer, a self-employed criminalist, testified as an expert on behalf of O'Dell. Familiar with the Intoxilyzer 5000 and having worked with its ADAMS data in other state law enforcement jurisdictions, Flaxmayer stated:

> I have personally seen instances where according to the paper records the intoxilyzer was working but the [ADAMS] data base shows either that the instrument was not working, that it had malfunctioned and broken in between those paper records. I've seen instances where [those operating the intoxilyzer] made mistakes, where there were other tests on defendants that were not reported. Basically just about any mistake a human can make you can find an example of in a database.

¶ 16 Flaxmayer elaborated further on the alleged inability of a paper record to truly reveal intoxilyzer errors. He stated that the Intoxilyzer 5000 detects and flags "mouth alcohol," which could distort test results, but that sometimes the paper record of a test in which that occurred is no longer available for unknown reasons. The mouth alcohol error is, however, noted on the card of the person tested. Additionally, he discussed operator errors, such as misinterpreting an event, allowing the suspect to blow at the wrong time, pressing the wrong button, or causing interference by transmitting on a nearby radio during testing. He stated he had seen instances where one of these errors had occurred, but an operator reported that nothing had happened or misinterpreted what had happened. Notwithstanding his testimony that these errors might not be accurately reported from other suspects' tests, he agreed these operator errors are all detected and flagged by the intoxilyzer and reported in some manner on the card of the suspect actually taking the test.

¶ 17 Another error Flaxmayer discussed was an operator's failure to check the hose to ensure it was warm enough to prevent condensation. Condensation in the hose lowers the reading, but condensation in the chamber could raise the reading. According to Flaxmayer, a paper record would establish when the hose was replaced, but not when it broke. Flaxmayer also stated he was concerned about "unstable reference," a problem that should result in the removal of the intoxilyzer from service. Where unstable reference occurs, a paper form reporting this should be filled out. Although Flaxmayer stated that he had seen instances in which a quality assurance report had failed to report unstable reference, he also acknowledged that unstable reference errors, when occurring during a test, would appear on the suspect's test card, and on the thirty-one-day and ninety-day test results, if occurring at those times as well.

¶ 18 Flaxmayer also testified about "interference subtraction," which could also result in inaccurate test results. But he stated this would be flagged by the intoxilyzer, and acknowledged that the ADAMS data would not

give any information in addition to that which was already contained in a paper record. Flaxmayer also testified that when the intoxilyzer solution is changed and gives high readings, if the solution is correct, the intoxilyzer could be out of calibration and in need of repair. Although Flaxmayer stated such a problem could appear in the ADAMS data, he also stated that such information would be contained in paper records. Ultimately he stated he had seen only six instances in his database where such a problem could have occurred, adding that the intoxilyzer would fail the thirty-one-day calibration test it this problem had occurred.

¶ 19 Notwithstanding his endorsement of preserving the Intoxilyzer 5000 data and his attempt to show the defects of paper records, Flaxmayer conceded that errors would not necessarily change the accuracy of the suspect's test, would not be recorded in the ADAMS data, or would not be helpful in determining the reliability of the particular suspect's test results. He also agreed that, while he would prefer to have access to the data, if the thirty-one-day and ninety-day test results did not reveal any problems and there were no maintenance problems in between, he would "believe [the intoxilyzer] to be working" on the subject tests. And, most importantly, Flaxmayer admitted that despite having as many as 80,000 tests in his data base, he could not report one inaccurate result when the concurrent calibration checks were within standard and proper procedures had been followed.

**b. Analysis**

¶ 20 The trial court found that the ADAMS data showed the intoxilyzer results were unreliable in particular tests, but made no findings with regard to O'Dell's test. And because Flaxmayer made no attempt to connect any of the intoxilyzer errors he discussed to O'Dell's case, his testimony would not support a finding of unreliability with regard to O'Dell. Further, the record is devoid of evidence that any paper records or mainte-

nance logs were not preserved or that operators had misinterpreted any events with regard to O'Dell. Additionally, according to Flaxmayer's testimony, any errors that reasonably could have affected the accuracy of O'Dell's test would have been reported on his test card or indicated somewhere in the paper record. Essentially, Flaxmayer's testimony consisted largely of generalities and was, at times, speculative, as evinced by the fact he could not cite one example in which the concurrent calibration checks on a test were within standard and the test had been inaccurate. Accordingly, his testimony was insufficient for the trial court to find that the lost ADAMS data was exculpatory under *Youngblood.*

¶ 21 Because the record fails to support a finding that the ADAMS data was exculpatory in this case, the trial court improperly concluded that the state had acted in bad faith under *Arizona v. Youngblood* and *State v. Youngblood.* See *Walker* (bad faith depends on knowledge of exculpatory nature of evidence at time of destruction). Flaxmayer's testimony failed to demonstrate the ADAMS data would show any problem had occurred on O'Dell's test. Furthermore, he could not identify one test result out of nearly 80,000 in which the concurrent calibration and other routine tests were within standards, but the result was inaccurate. Thus, the chances are extremely low that the ADAMS data would have been exculpatory. See *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984) (lost evidence with "extremely low" possibility of exculpating defendant not constitutionally material). And, finally, the state was acting in accordance with its standard procedure which complied with all Department of Health Services (DHS) regulations. Accordingly, we disagree with the trial court's conclusion of bad faith. See *Trombetta; Dunlap; Walker.*[5]

**OTHER CASES**

¶ 22 The trial court relied on other Arizona cases to further support its ruling. First,

5. O'Dell also suggests we apply a balancing test in this analysis. Under a balancing test, O'Dell could show that the state could preserve the intoxilyzer memory at minimal expense. But our supreme court has expressly rejected the

balancing test in this context. *State v. Bocharski,* 200 Ariz. 50, ¶¶ 42–43, 22 P.3d 43, ¶¶ 42–43 (2001); *State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152 (1993).

relying on *State ex rel. McDougall v. Superior Court*, 181 Ariz. 202, 888 P.2d 1389 (App. 1995) and *Moss v. Superior Court*, 175 Ariz. 348, 857 P.2d 400 (App.1993), the trial court concluded that dismissal was proper because "Arizona case law mandates that persons accused of DUI have an opportunity to rebut the prima facie showing that an intoxilyzer" was operating correctly and to attack the intoxilyzer's reliability before the jury.

¶ 23 But these cases are actually favorable to the state, both establishing limitations on the state's obligations in a DUI case in light of the reliability of the Intoxilyzer 5000. *See Moss*, 175 Ariz. at 353, 857 P.2d at 405 ("The Intoxilyzer 5000 is a very accurate and reliable testing method with built-in safeguards."). And, although the court stated in *McDougall* that a defendant may subpoena "any ... evidence that potentially could rebut" the state's prima facie showing, *id.* at 206, 888 P.2d at 1393, that is a far cry from the conclusion that the state is required to preserve evidence in a particular form. Additionally, because the evidence here has been lost by being overwritten in the intoxilyzer memory, it is more appropriate that we look to decisions on lost evidence to determine if a due process violation has occurred. Finally, as the state points out, the evidence discussed in DUI case law before the introduction of the Intoxilyzer 5000 memory remains available to defendants today. Accordingly, neither *McDougall* nor *Moss* supports the trial court's dismissal.

■ ¶ 24 The trial court also concluded that preservation of the ADAMS data was necessary to comport with "[t]he policy concern of statewide uniformity in the administration of breath testing" under *Fuenning v. Superior Court*, 139 Ariz. 590, 680 P.2d 121 (1983). In *Fuenning*, our supreme court held that, based on statute and in the interest of uniformity, the state must produce foundational evidence that standard statewide procedures adopted by DHS have been followed. O'Dell argues that because law enforcement jurisdictions in Maricopa Coun-

ty disclose the ADAMS data, *Fuenning* requires that all Arizona jurisdictions do the same. But O'Dell has not shown that the state failed to comply with any statute, regulation, or foundational requirement. And, he has not demonstrated that any statute or department of the state has dictated that agencies capture and disclose the ADAMS data. Accordingly, *Fuenning* is inapposite.

¶ 25 O'Dell also argues that the unique nature of DUI cases justifies finding a due process violation here. He correctly notes that several cases have established special affirmative duties on behalf of the state in the DUI context.[6] But these are exceptions to the general rule, declared by our supreme court, that the state is not required to gather exculpatory evidence on a defendant's behalf. *See Montano v. Superior Court*, 149 Ariz. 385, 390–91, 719 P.2d 271, 276–77 (1986). Unless the supreme court expands the DUI exception in this context, we are bound by prior cases refusing to impose such a duty on the state.

## CONCLUSION

¶ 26 *Brady, Arizona v. Youngblood*, and their progeny simply do not require suppression of BAC test results and dismissal of DUI charges due to the routine purging of the Intoxilyzer 5000 memory data. Interpreting these cases too broadly could conceivably deter the state from improving intoxilyzer technology. By our ruling in this case, we are not deciding what the result should be in a case in which maintenance logs or other records indicate there has been a problem with a given intoxilyzer machine that may have affected the accuracy of test results obtained through the use of that machine. Nor should our decision be construed as approving of the destruction or loss of any exculpatory maintenance logs or error information. And we are not denying that in an appropriate case, an instruction pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.2d 274

---

6. *State ex rel. Dean v. City Court*, 163 Ariz. 510, 789 P.2d 180 (1990); *State v. Velasco*, 165 Ariz. 480, 799 P.2d 821 (1990); *Montano v. Superior Court*, 149 Ariz. 385, 719 P.2d 271 (1986); *Scales v. City Court*, 122 Ariz. 231, 594 P.2d 97 (1979); *Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979).

(1964), may be warranted. But, because the state is under no federal or state statutory or due process obligation to preserve the Intoxilyzer 5000 data, and because there was an insufficient showing here that the data contained exculpatory evidence, the trial court erred in dismissing the prosecution.

¶ 27 The trial court's ruling is vacated, and we remand for further proceedings.

CONCURRING: PHILIP G. ESPINOSA, Chief Judge, and WILLIAM E. DRUKE, Judge.